IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 14, 2007 Session

## LINDA MAE (EDWARDS) MALOY v. PAUL DAVID MALOY (AKA DAVID ANTHONY)

Appeal from the Circuit Court for Wilson County
No. 5189DV      Clara W. Byrd, Judge

No. M2006-02463-COA-R3-CV - Filed January 31, 2008

This is a divorce case. The husband is a musician and songwriter; the wife is a medical assistant. During the marriage, the husband became physically incapacitated, and the wife quit her job and took care of him. The parties' living expenses and costs associated with the husband's medical care were funded through monies that the wife inherited as well as credit cards. This resulted in significant credit card debt. The husband eventually recovered, but was deemed completely disabled and received social security disability payments during the marriage. The wife then had a health crisis. During the wife's health crisis, the husband took over the parties' finances, and both parties signed a document outlining division of the parties' property in the event of divorce. Over a year later, the wife filed for divorce, based in part on the husband's failure to care for her during her health crisis. The husband counterclaimed for divorce. After declaring the parties divorced, the trial court held a trial on the issue of property division. After one day of testimony, the husband filed a motion seeking to enforce the document signed by the parties purporting to divide their property in the event of divorce. After the hearing, the trial court refused to enforce the alleged agreement. It divided the marital property, including in the marital estate the social security disability payments that had been received by the husband. The trial court refused, however, to divide the parties' marital debt. The husband appeals the trial court's refusal to enforce the alleged agreement and the inclusion of his social security disability benefits in the marital estate. Both parties appeal the trial court's failure to divide the marital debt. We affirm in part and reverse in part, finding that (1) the social security disability payments were properly included in the marital estate, (2) the document is neither an MDA nor an enforceable postnuptial agreement, and (3) the trial court erred in refusing to divide the parties' marital debt.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part; Reversed in Part; and Remanded**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which DAVID R. FARMER, J., and STEVE R. DOZIER, SP. J., joined.

Mark W. Henderson, Lebanon, Tennessee, for the Defendant/Appellant, Paul David Maloy.

Thomas F. Bloom, Nashville, Tennessee, for the Plaintiff/Appellee, Linda Mae (Edwards) Maloy.

**OPINION**

Defendant/Appellant Paul David Maloy ("Husband") and Plaintiff/Appellee Linda Mae Edwards ("Wife") were married on May 30, 1992.  Under the name "David Anthony," Husband worked as a musician and regularly played acoustic guitar on tour with renowned country music singer George Strait.[1]  Husband is also a songwriter and receives royalty payments from the songs he has written.  During part of the marriage, Wife worked as a medical assistant in a physician's office.  No children were born of the parties' marriage.

During the marriage, the parties purchased some real property, primarily with monies Wife had inherited.  These were used as rental property to generate income.

As a result of a childhood  injury, Husband had to have several neck surgeries as an adult.  In approximately 2000, after Husband's third neck surgery, Wife quit her job as a medical assistant to travel with Husband on tour with George Strait.  Soon after that, Husband began experiencing serious difficulty with his neck, and before long was almost completely paralyzed.  In light of Husband's condition, Wife remained unemployed and became his full-time caregiver.  Husband's condition did not improve, so the parties sought treatment for him at the Mayo Clinic in Jacksonville, Florida.  Between 2000 and late 2003, the parties made eleven trips to Jacksonville.  Neither Wife nor Husband was employed during Husband's health crisis, so their expenses were financed by royalty payments, income from rental property, credit cards, and money that Wife had inherited from her grandmother in 2002.  The credit card debt attributable to Husband's treatments in Jacksonville totaled some $80,000.  Fortunately, the treatments also resulted in a marked improvement in Husband's condition.

In July 2003, as Husband was still undergoing treatment at Mayo Clinic, the parties purchased additional investment real estate to use as rental property.  Those purchases were likewise made with Wife's inheritance monies.

Husband learned of the parties' substantial credit card debt in 2004, after he had finished his treatments at the Mayo Clinic.  When Husband found out about the debt, he insisted on taking over

---

[1]Apparently the parties did not agree with the sentiment expressed in a popular George Strait song:

> Just give it away
> There ain't nothing in this house worth fightin' over
> Oh, and we're both tired of fightin' anyway
> So just give it away.

GEORGE STRAIT, *Give It Away, on* IT JUST COMES NATURAL (MCA Nashville 2006).

the parties' finances. After doing so, Husband sold some real estate that the parties owned and took out a loan of $44,000, secured by another parcel of jointly-owned real property, in order to pay down some of the credit card debt. (Id. at 135-136). He also closed a checking account, apparently not realizing that Wife's health insurance premiums were being automatically withdrawn from that account. Husband's financial decisions caused significant discord between the parties.

Meanwhile, Wife began working again and Husband applied for Social Security disability benefits, asserting that he was physically disabled. In July 2004, Husband attended a hearing on his request for benefits; Wife did not attend the hearing because she was at work. At the hearing, Husband learned that he would receive back payments of disability benefits, relating to a period of disability beginning in February 2002. He did not inform Wife of what he had learned.

On approximately August 22, 2004, while Husband and Wife were visiting Husband's children from a prior marriage in Oklahoma, Wife had to undergo emergency colostomy surgery. After the surgery, the parties learned that Wife's health insurance had been cancelled because Husband had closed the checking account from which the insurance premium payments were automatically withdrawn. Consequently, the parties were liable for the cost of Wife's emergency surgery, which was approximately $57,000.

In late August 2004, shortly after the parties returned to Tennessee following Wife's emergency surgery, the parties signed a document which purported to allocate the parties' marital property in the event of a divorce. Their signatures were not notarized. The parties continued to live together after the agreement was executed. Wife would later assert that Husband coerced her into signing the document, and that he refused to care for her after her surgery.

In May 2005, Husband received a royalty payment of approximately $50,000. By that time, the parties were separated. Husband gave Wife $5,000 out of the royalty payment, apparently leading her to believe that this was half of the total payment he received.

After all of these events, in September 2005, Wife filed for divorce, claiming irreconcilable differences and inappropriate marital conduct. The trial court entered an order prohibiting either party from encumbering, dissipating, or disposing of marital property pending the trial. Husband answered Wife's petition and counterclaimed for divorce. Wife sent discovery requests to Husband, to which he did not respond, despite repeated motions to compel and an order to compel. Wife also filed a motion to hold Husband in contempt of court for disposing of marital assets in violation of the temporary injunction.

In January 2006 and March 2006, Husband received two payments of back Social Security disability benefits totaling approximately $68,000. The first payment of back disability benefits was

placed in escrow. The second payment apparently was not escrowed, and Husband spent a substantial portion of the monies, allegedly in violation of the injunctive order.[2]

Without having received any of the requested discovery materials, Wife took Husband's deposition in April 2006. During this deposition, Wife learned that Husband had allegedly violated the injunctive order regarding the Social Security disability payments that he was awarded in September 2005.

On April 3, 2006, the trial court declared the parties divorced and set a hearing for May 18, 2006 regarding the division of marital property and any remaining issues.

On May 17, 2006, Wife filed a motion to compel Husband to file the exhibits for his deposition, taken the month before. At the scheduled hearing the next day, the evidence showed that Husband had received past due Social Security disability payments in January 2006 and March 2006 in the total amount of $68,883.00. These related to a period of disability beginning on February 1, 2002. At the May 18 hearing, Wife testified that, on the day that the administrative law judge informed Husband that he had been found disabled and would receive an award of past due benefits, Wife was not in court because she had gone back to working as a medical assistant. Wife said that Husband falsely told her after the administrative hearing that he did not know whether he would be receiving benefits. She did not find out about Husband's award of disability benefits until he received a notification in the mail.

The January 2006 Social Security check was deposited into an escrow account. The second check, however, went directly to Husband. When Husband received the second check, he spent approximately $21,000 on cars, watches, attorney's fees, a trip, and improvements to real estate that he sought to keep. Husband testified that his attorney at that time advised him that the Social Security benefits were his separate property to spend as he wished.

Wife also testified that she received only $5,000 out of the approximately $50,000 in royalties payments that Husband received in May 2005, after the parties had separated. Wife said that Husband kept the remainder and that she did not know where the rest of the money went. In his testimony, Husband could not account for how he spent the balance of the $50,000 royalty payment.

The trial court heard testimony on five properties purchased by the parties. Their first marital home, located in the Richmond Hills neighborhood in Lebanon, was purchased with $96,000 of Wife's inheritance money. This was later sold and the proceeds used to building the parties' next marital home on Old Rome Pike also in Lebanon.

The next property, a four-unit apartment building on Anderson Avenue in Lebanon, was purchased in 1998 with $34,000 of Wife's inheritance money. Another $109,000 of Wife's inheritance money was used to pay off this property during Husband's health crisis.

---

[2]The first back payment of $30,000, received in January 2006, was placed in escrow by Husband's first attorney, Julie Rowland. That amount apparently remained in escrow until resolution of the parties' divorce. Between January 2006 and March 2006, when Husband received the second back payment, Husband had changed attorneys, retaining Mark Henderson. Husband spent a significant portion of this second payment.

In approximately July 2003, the parties purchased two more investment properties, one on Kent Drive and the other on South Maple Street, both in Lebanon. All four of these properties were owned by the parties as tenants by the entireties.

After the May 18 hearing, on May 25, 2006, Wife filed an emergency motion to hold Husband in contempt for allowing the mortgage on the marital home to fall into arrears. The next day, Husband was ordered to pay the mortgage arrearage by the end of the month.

On that same day, Husband filed a motion to amend his counterclaim to assert the August 29, 2004 document executed by the parties a few days after Wife's emergency colostomy surgery. Husband explained that he was seeking to enforce the alleged agreement at this late stage because the Tennessee Supreme Court had just decided a case that he believed required its enforcement. He characterized the document as a marital dissolution agreement that governed the division of marital property.

Under the document signed by the parties, in the event of a divorce, Husband would be allocated both the Kent Drive property and the South Maple property. The document stated that the parties' two remaining properties would be sold, and the proceeds split between the parties. It provided that Wife would pay the hospital bills relating to her surgery and Husband would pay the hospital bills relating to his surgery. The parties would share equally any royalties received from songs written by Husband during the marriage. The document did not mention Social Security disability benefits to be received by Husband.

On June 23, 2006, the trial court allowed Husband to the amend his counterclaim to assert the agreement. Consequently, the second day of trial testimony related primarily to the alleged agreement.

This second day of testimony took place on July 13, 2006. At this hearing, Wife acknowledged that she typed the agreement and signed it. She asserted, however, that its terms were the result of Husband's coercion and duress. She testified as follows:

> We had just come from Oklahoma, where I had had emergency surgery. I had a colostomy. I was wearing a colostomy bag. And [Husband] was furious with me over money he thought I had spent and I shouldn't. And he was going to put our house on the market. And I begged him not to because I couldn't stand the thought of people coming, looking at our house, when I as trying to take care of my own self. And . . . he said that if I would write [up the agreement] . . . that he wouldn't put the house on the market until I got my reverse surgery done.

Husband asserted that the alleged agreement was enforceable, and characterized it as dividing the parties' marital property equally. It is undisputed that it does not address some items, including Husband's Social Security disability payments, and that the parties' signatures were not notarized. Wife did not amend her pleadings to assert the defense of coercion. Husband's attorney did not object to Wife's testimony on the issue of coercion and duress. That concluded the evidence presented to the trial court.

On July 28, 2006, the trial court entered its order on the division of the parties' property. The trial court declined to divide the marital property in accordance with the August 29 document signed by the parties, noting that it was not notarized, that neither party consulted an attorney, that the parties filed for divorce much later without any apparent reliance upon the document, and that property was sold and debt incurred between execution of the document and the divorce. At the time that it was executed, Wife had just come home following surgery and was still medicated and in pain, and in addition, the document divided the marital property inequitably. The trial court found that Wife was coerced into signing the alleged agreement and signed it under duress. Therefore, the court divided the property without regard to the document.

The trial court found that Husband had received $68,883 in past due Social Security disability payments, and concluded, based on Tennessee Code Annotated § 36-4-121(b)(1)(C)[3], that these payments were marital property. The court also noted that Husband had received royalty payments for songs that he had written during the marriage, and concluded that all royalty payments received in 2005 and 2006, as well as payments to be received in future years from songs that Husband wrote or produced during the marriage, were marital property.

As to the parties' real property, the trial court concluded that all four properties owned by the parties were marital property. The trial court noted that, although Wife had used her inheritance money to purchase the properties, all of the properties were owned as tenants by the entirety. Such joint ownership, the court concluded, made them marital property. The trial court found that the Old Rome Pike property had a net equity of $100,000, that the Anderson Avenue property had a net equity of $147,272, that the Kent Drive property had a net equity of $8,287, and that the Maple Street property had a net equity of $53,949.

The trial court then divided the marital property. It commented at the outset that, in this case, an equal division of the marital property would not be an equitable division, (Id. at 16) based on three important findings: Husband had dissipated marital assets; Wife had to stay out of work and lose income and rights to Social Security benefits while caring for Husband, causing her to lose her right to Social Security benefits were she to be injured; and Wife had spent virtually her entire inheritance on the marriage.

To Husband, the trial court awarded the Kent Drive property, the South Maple Street property, all $68,883 of his past due Social Security disability benefits (finding that he had already dissipated much of it), the $45,000 in 2005 royalty payments for which he could not account, half of the royalties received in 2006 and future years from songs written or produced during the marriage, and all personal property in his possession. To Wife, the trial court awarded the Old Rome Pike property, the Anderson Avenue property, the $5,000 from the 2005 royalties that she had already received, half of 2006 and future royalties from songs written or produced during the marriage, and all personal property in her possession. Based on the net equity in each parcel of real

---

[3]Tennessee Code Annotated § 36-4-121(b)(1)(C) states that marital property includes "recovery in personal injury, workers' compensation, social security disability actions . . . ."

property as found by the trial court, Husband was awarded approximately $176,000 worth of marital property and Wife was awarded approximately $252,000 worth of marital property.

The trial court then addressed the marital debt. It found that the parties had $169,000 in marital debt, but declined to divide it, stating: "[The debt] was all incurred during the marriage. I'm not finding that either of the parties has a specific obligation to pay . . . because I'm going to leave that up to the creditors to prove who owes it." As to the parties' debt to the IRS, however, the trial court found that the parties were equally responsible for the $14,000 debt.

Finally, the trial court ordered Husband to pay Wife's attorney's fees in the amount of $6,495, based on Husband's "willful violation of the restraining orders" and because of Husband's continued failure to respond to discovery requests and comply with court orders.

After entry of the order, Husband filed a motion for a new trial or alternatively to alter or amend, as well as a motion for the trial judge to recuse herself from further proceedings in the matter. Both motions were denied.

On appeal, Husband raises several issues for review. He claims that the trial court committed error (1) in refusing to enforce the August 29, 2004 agreement, (2) by including Husband's back Social Security benefits in the marital estate, (3) by failing to make an equitable distribution of the marital property, and (4) by ordering Husband to pay Wife's attorney's fees. Both parties appeal the trial court's refusal to divide the parties' marital debt.

## ANALYSIS

We review the trial court's findings of fact *de novo* on the record with a presumption that they are correct, unless the evidence preponderates against the findings. Tenn. R. App. P. 13(d). We review the trial court's conclusions of law *de novo* with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993).

Husband argues first that the trial court erred in refusing to enforce the August 29, 2006 document signed by the parties. In support of his argument, Husband cites ***Barnes v. Barnes***, 193 S.W.3d 495 (Tenn. 2006). In ***Barnes***, the parties entered into a marital dissolution agreement before filing for divorce. ***Barnes***, 193 S.W.3d at 501. The wife obtained a marital dissolution agreement form from the internet without either party consulting an attorney. ***Id.*** at 497. In addition to dividing the parties's marital property, the agreement required the husband to pay child support and spousal support. ***Id.*** Both parties signed the form agreement in the presence of a notary public, who acknowledged each party's signature. ***Id.*** The husband repudiated the agreement before it was approved by the trial court. The trial court nevertheless enforced the agreement. ***Id.*** The intermediate appellate court reversed the trial court's order "to the extent that it enforce[d] or incorporate[d] the [marital dissolution agreement]." ***Barnes v. Barnes***, No. W2004-01426-COA-R3-CV, 2005 WL 517536, at *5 (Tenn. Ct. App. Mar. 4, 2005).

The Tennessee Supreme Court reversed the Court of Appeals and reinstated the trial court's decision, enforcing the agreement. ***Barnes***, 193 S.W.3d at 497. The husband in ***Barnes*** argued that

his repudiation of the agreement prior to the trial court's judgment in the matter rendered the agreement unenforceable. *Id.* at 498. The Tennessee Supreme Court rejected this argument, stating, "A marital dissolution agreement may be enforceable as a contract even if one of the parties withdraws consent prior to the entry of judgment by the trial court, so long as the agreement is otherwise a validly enforceable contract." *Id.* at 499. In the absence of fraud, coercion or some other circumstance that would have made the agreement invalid, the **Barnes** Court concluded, the Husband's repudiation of the agreement did not prevent its enforcement. *Id.* at 499-502.

In the case at bar, Husband argues that the document signed by the parties is a valid marital dissolution agreement (MDA) and that the trial court should have divided the marital property in accordance with it. Tennessee Code Annotated § 36-4-103 provides:

> In lieu of service of process, the defendant may enter into a written *notarized* marital dissolution agreement with plaintiff that . . . states that the defendant is aware that [a divorce] will be filed in this state and that the defendant waives further service and waives filing an answer to the complaint.

T.C.A. § 36-4-103(a)(2) (2005) (emphasis added). Thus, the statute refers expressly to an enforceable MDA as being notarized. It is undisputed that the document, though signed by the parties, was not notarized. In addition, it did not indicate that the parties contemplated an imminent divorce, and did not otherwise comply with this statute. Indeed, over a year passed before Wife filed her petition for divorce. Thus, the trial court did not err in finding that it was not a valid, enforceable MDA.

Moreover, even if it were a valid MDA, Tennessee Code Annotated § 36-4-103(b) states that the trial court may not grant a divorce on the ground of irreconcilable differences "unless the Court affirmatively finds . . . that the parties have made adequate and sufficient provision by written agreement . . . for the equitable settlement of any property rights between the parties." Here, the trial court specifically found that the document divided the parties' property in an inequitable manner and the record fully supports this finding. The purported agreement would award Husband two of the parties' parcels of real property outright and half of the proceeds from the sale of the other two. While Husband would have a place to live after the division of property, Wife would not, because the only properties that would not be owned by Husband would be sold and the proceeds divided. The document contained no recognition of the fact that virtually all of the parties' realty was purchased by using Wife's separate inheritance monies. As for the debt incurred because of the parties' respective medical crises, the document required Wife alone to be responsible for the expense of her emergency surgery, which was uninsured because Husband's actions resulted in the cancellation of Wife's health insurance. Finally, it did not address Husband's anticipated Social security disability benefits, even though, by the time the document was signed, the administrative law judge had informed Husband that he would be paid back benefits. Under all of these circumstances, even if the document were deemed a valid MDA, the trial court's finding that its property division was inequitable is fully supported.

It is unclear whether Husband argues on appeal that the document should have been enforced as a valid postnuptial agreement. If so, then it must fully meet the standards for such an agreement.

-8-

The Tennessee Supreme Court has stated, "Because of the confidential relationship which exists between husband and wife, postnuptial agreements are . . . subjected to close scrutiny by the courts to ensure that they are fair and equitable." *Bratton v. Bratton*, 136 S.W.3d 595, 601 (Tenn. Ct. App. 2004) (citations omitted). The *Bratton* Court elaborated:

> The relationship of husband and wife is one of special confidence and trust, requiring the utmost good faith and frankness in their dealing with each other. . . . Transactions of this character are scrutinized by the courts with great care, to the end that no unjust advantage may be obtained by one over the other by means of any oppression, deception, or fraud. Courts of equity will relieve against any unjust advantage procured by any such means, and less evidence is required in such cases to establish the fraud, oppression, or deception than if the parties had been dealing at arms' length as strangers. . . .

*Id.* at 601 (quoting *Estate of Gab*, 364 N.W.3d 924 (S.D. 1985)). It must be clear "that the agreement is free from fraud, coercion or undue influence, that the parties acted with full knowledge of the property involved and their rights therein, and that the settlement was fair and equitable." *Id.* at 600.

Other jurisdictions place the burden of proving the fairness of a postnuptial agreement on the party seeking its enforcement. Such party must show that the " 'entire transaction was fair, just and equitable' from the other party's point of view *or* 'that the agreement was freely and voluntarily entered into . . . with competent, independent advice and full knowledge of [any] interest in the estate and its approximate value.' " *Tibbs v. Anderson*, 580 So.2d 1337, 1339 (Ala. 1991) (applying the standard used to evaluate antenuptial agreements to postnuptial agreements), *cited with approval in Bratton*, 136 S.W.3d at 600 (quoting *Barnhill v. Barnhill*, 386 So.2d 749, 751 (Ala. Civ. App. 1980)).

Here, as set forth above, the settlement outlined in the document hardly fits the description of "fair, just and equitable." It provides amply for Husband, with decidedly less for Wife, despite the fact that all of the parties' real estate assets were purchased by using Wife's inheritance monies.

Further, the evidence shows not that Wife had "competent, independent advice" or "full knowledge" of the marital estate, but rather that Husband failed to disclose key information, including over $40,000 in royalty payments and his anticipated Social Security disability benefits.

In addition, Wife testified that the purported "agreement" was the product of Husband's anger at learning that Wife's health insurance had lapsed because Husband had closed the checking account from which the premiums were being automatically withdrawn. She said that, within days of her surgery, while she was still in pain and on medication, Husband threatened to put their marital home on the market immediately unless Wife typed up and signed the document with the terms that Husband dictated. The trial court, after hearing the parties' testimony on the circumstances surrounding execution of the purported agreement, found that Wife had signed the document under duress and refused to enforce it.

Husband argues that Wife did not plead the affirmative defense of duress, and that, under the Tennessee Rules of Civil Procedure, she was required to do so in order to succeed on that defense at trial. Tenn. R. Civ. P. 8.03. Therefore, Husband contends, the alleged agreement cannot be invalidated on that basis. In this case, however, the burden of proof was on Husband, as the party seeking to enforce the postnuptial agreement, to establish that the alleged agreement was "freely and voluntarily entered into." *Tibbs*, 580 So.2d at 1339. The trial court found that Husband had not carried his burden in proving these elements, and the evidence does not preponderate against its finding. Thus, we affirm the trial court's refusal to enforce the alleged agreement.

Husband next argues that the trial court erred in considering Husband's back Social Security disability benefits as marital property. Tennessee statutes provide that marital property may include "recovery in . . . social security disability actions . . . ." T.C.A. § 36-4-121(b)(1)(C) (2005). The trial court relied on this provision in including Husband's Social Security disabilities monies in the marital estate. Husband maintains that this was error by relying on the case of *Frazier v. Frazier*, No. 01-A-019010CV00379, 1991 WL 27368 (Tenn. Ct. App. Mar. 6, 1991).

In *Frazier*, the wife was awarded a divorce from her husband based on inappropriate marital conduct. *Frazier*, 1991 WL 27368, at *1. During the marriage, the husband was found to be temporarily disabled and was awarded Social Security benefits in the amount of $829 per month. *Id.* In the course of the property division, the trial court included these benefits in the marital estate and ordered that the wife would receive $300 per month out of the husband's total monthly benefit. *Id.* The court of appeals reversed the trial court based on 42 U.S.C. § 407(a), the antiassignment clause of the federal Social Security Act, which provides:

> The right of any person to any *future* payment under this subchapter shall not be transferable or assignable, at law or in equity, and none of the moneys *paid* or *payable* or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law.

42 U.S.C.A. § 407(a) (1998) (emphasis added). The *Frazier* court stated, "Without a doubt, [section 407(a)] precludes state courts from awarding one spouse's social security benefits to the other as marital property." *Frazier*, 1991 WL 27368, at *1 (citing *In re Marriage of Swan*, 720 P.2d 747 (Or. 1986)).

In *Frazier*, then, the trial court awarded the wife a portion of the husband's future Social Security benefits, and this was held to be prohibited under the federal statute. In contrast, in this case, the trial court considered only Husband's past Social Security benefits as marital property, and did not award any portion of them to Wife. Thus, the facts in this case are clearly distinguishable

from the facts in *Frazier*. We note that the federal statute refers expressly to "future" Social Security benefits.[4] *See* 42 U.S.C.A. § 407(a) (1998).

Thus, Tennessee appellate courts have not directly addressed the issue presented in this case, namely, whether a spouse's past Social Security disability benefits may be considered marital property for purposes of property division.[5] Even assuming, however, that Husband's back Social Security disability benefits payments should not have been included in the marital estate, we find that the trial court's action was harmless error. On appeal, we are mindful that the trial court has "wide discretion in dividing the marital estate upon divorce." *Loyd v. Loyd*, 860 S.W.2d 409, 411 (Tenn. Ct. App. 1993) (citing *Lancaster v. Lancaster*, 671 S.W.2d 501, 502 (Tenn. Ct. App. 1984)). Although an equal division of property can be deemed equitable, the trial court is not required to make an equal division, only an equitable one. *Ferrell v. Ferrell*, No. M2003-02435-COA-R3-CV, 2005 WL 1713866, at *2 (Tenn. Ct. App. July 22, 2005); *Fox v. Fox*, No. M1999-01720-COA-R3-CV, 2001 WL 356703, at *7 (Tenn. Ct. App. Apr. 11, 2001). In making an equitable division of property, the trial court is required to consider factors such as the contribution each party made to the acquisition or dissipation of marital property, the economic circumstances of each party at the time of the division of property, and the amount of Social Security benefits available to each spouse. T.C.A. § 36-4-121(c)(5), (8), (10) (2005). An unequal division of property may be found equitable where one spouse brought more property to the marriage and the other dissipated marital assets. *See Ferrell*, 2005 WL 1713866, at *1-2. In this case, the trial court found that Husband had dissipated significant marital assets, that virtually all of Wife's substantial inheritance was used to acquire marital property, that Wife's monthly income was less than that of Husband because she had only recently returned to work, and that Wife's eligibility for Social Security benefits was adversely affected by the parties' joint decision that she remain unemployed in order to care for Husband during his health crisis.

If Husband's back Social Security benefits are included in the marital estate, the trial court's findings regarding the value of the marital property yields an estate valued at approximately $428,391, with Husband receiving assets valued at approximately $176,119, or 41% of the total

---

[4]The antiassignment provision, however, also refers to "moneys *paid* or payable. . . ." 42 U.S.C.A. § 407(a) (1998) (emphasis added).

[5]Courts in other jurisdictions have adopted differing views on the effect of the antiassignment provision of the Social Security Act on the division of marital property in divorce cases. One line of cases holds that Social Security benefits may not be considered in any fashion because that doing so would conflict with the federal statute. *See In re Marriage of Swan*, 720 P.2d 747, 752 (Or. 1986) ("the effect of including the value of either spouse's Social Security benefits in the property to be divided is to allow the trial court to divide that value between the spouses. This conflicts with 42 U.S.C. §[] 407. . . ."). Other courts adopt a more moderate interpretation, holding that "[a]lthough a party's Social Security benefits cannot be divided as a marital assets, those benefits may be considered by the trial court under the catchall category as a relevant and equitable factor in making an equitable distribution." *Neville v. Neville*, 791 N.E.2d 434, 436-37 (Ohio 2003). We note that Tennessee courts have routinely considered Social Security benefits in making awards of alimony. *See, e.g., Morton v. Morton*, 182 S.W.3d 821, 835 (Tenn. Ct. App. 2005) ("We leave in place that portion of the Trial Court's division of Husband's Social Security benefits providing that Wife will receive half of the benefit amount received by Husband each month once he starts drawing his Social Security benefits."); *see also* T.C.A. § 36-4-121(b)(1)(C) (2005).

estate,[6] and Wife receiving assets valued at approximately $252,272, or 59% of the estate.[7] This property division is supported by sufficient evidence and is within the range of acceptable alternatives, and would not constitute an abuse of discretion. ***See BIF, a Div. Of Gen. Signals Controls, Inc. v. Serv. Constr. Co., Inc.***, No. 87-136-II, 1988 WL 72409, at *3 (Tenn. Ct. App. July 13, 1988). We find no error in this allocation of the marital property.

Removing the Social Security benefits from the marital estate leaves the marital estate with a total value of approximately $359,508.[8] Of this, Wife received property valued at $252,272, or 70% of the total estate, and Husband received property valued at $107,236, or approximately 30% of the total marital estate. While subtracting Husband's back Social Security benefits makes the parties' respective percentages more lop-sided, considering the trial court's findings of fact, such a division of property would not have been inequitable and is still within the range of acceptable alternatives. ***See id***. Accordingly, any error committed by including Husband's Social Security benefits in the marital estate was harmless error. ***See*** Tenn. R. App. P. 36(b).

Husband argues that the trial court also committed error by awarding Wife her attorney's fees in the amount of $6,495. A trial court's award of attorney's fees in a divorce action "is considered an award of alimony." ***Long v. Long***, 957 S.W.2d 825, 829 (Tenn. Ct. App. 1997) (citing ***Cranford v. Cranford***, 772 S.W.2d 48 (Tenn. Ct. App. 1989)). We will not overturn such an award "except where there is a clear showing that the trial court reached the wrong conclusion, with a result that manifest injustice would be done if the award is allowed to stand." ***Id.*** (citing ***Hanover v. Hanover***, 775 S.W.2d 612 (Tenn. Ct. App. 1989)). Whether the spouse ordered to pay the fees has the ability to do so is an important factor. ***See Lindsey v. Lindsey***, 976 S.W.2d 175, 181 (Tenn. Ct. App. 1997). For example, an award of attorney's fees will not be disturbed where the record from the trial court indicates that the obligor spouse not only had the ability to pay, but was also responsible for prolonging the action. ***See id.***

In this case, the trial court found that Husband repeatedly failed to respond to discovery requests, failed to comply with multiple court orders, and dissipated marital assets in willful violation of the trial court's injunctive order. The trial court found that Husband's conduct unnecessarily prolonged this action. Furthermore, Husband was awarded most of the liquid assets, such as the royalty payment and the Social Security back benefits, and was therefore more capable of paying the attorney's fees. We find sufficient support in the record for the trial court's findings and for its award of Wife's attorney's fees. The award is therefore affirmed.

---

[6]This value includes Husband's Social Security benefits, the Kent Drive property, the Maple Street property, and $45,000 worth of the 2005 royalties.

[7]This value includes the Old Rome Pike property, the Anderson Avenue property, and $5,000 of the 2005 royalties.

[8]This figure is based on the trial court's findings regarding the net equity in each of the parties's real properties and the finding that the 2005 royalties amounted to approximately $50,000. It includes the Anderson Avenue property (net equity = $147,272), the Old Rome Pike property (net equity = $100,000), the Kent Drive property (net equity = $8,287), the Maple Street property (net equity = $53,949), and the 2005 royalties in the amount of $50,000.

Finally, both Husband and Wife argue on appeal that the trial court erred by not equitably dividing the parties' marital debt. The trial court classified the parties's debts as marital debt, but refused to allocate them, stating, "I'm going to leave [the debt] up to the individual creditors . . . to determine which [party] they want to pursue."

"[M]arital debts are subject to equitable division in the same manner as marital property." *Alford v. Alford*, 120 S.W.3d 810, 813 (Tenn. 2003) (citing *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 243 (Tenn. Ct. App. 1995)). The Tennessee Supreme Court has defined marital debt as "all debts incurred by either or both spouses during the course of the marriage up to the date of the final divorce hearing." *Id.* In allocating marital debt, trial courts are instructed to consider four factors as guidelines: "(1) the debt's purpose; (2) which party incurred the debt; (3) which party benefitted from incurring the debt; and (4) which party is best able to repay the debt." *Id.* at 814 (citing *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989)).

The allocation of marital debt is as important as dividing the marital property in bringing about a fair and just resolution of the parties' divorce. The trial court's explicit refusal to do so, leaving the parties instead to the vagaries of their creditors, is mystifying. We reverse that part of the trial court's decision, and remand for an equitable division of the parties' marital debt.

Wife also argues that Husband should be ordered to pay her attorney's fees for this appeal. "That the courts have authority to award counsel fees [on appeal] is clear." *Seaton v. Seaton*, 516 S.W.2d 91, 93 (Tenn. 1974). We find Wife's request to be appropriate and order Husband to pay Wife's fees for this appeal. Accordingly, we remand to the trial court for a determination of the appropriate amount of fees to award for this appeal.

In sum, we reverse the trial court's refusal to divide the marital debt. The remainder of the trial court's decision is affirmed. The cause is remanded for division of the marital debt and a determination of the amount of Wife's attorney's fees for this appeal.

The decision of the trial court is affirmed in part and reversed in part, as set forth above, and the cause is remanded for further proceedings consistent with this opinion. Costs on appeal are taxed to Defendant/Appellant Paul David Maloy, and his surety, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE